IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Edita Applebaum<br><br>PLAINTIFF<br><br>V.<br><br>William P. Fabian,<br>Laurence W. Gold,<br><br>&<br><br>Efraim "Frank" Rajs, Cecilia Keh,<br>Thomas D'Ambrosio,  Maxine Melnick,<br>Leah E. Capece<br><br>&<br><br>Michael Lackey, Gerald Macko, Derek<br>Schumacher, Jimmy Samayoa, Garrett<br>Applebaum ,<br>Youssef Abdulah Youssef,<br>&<br>Voya Financial, Inc.,<br>Intac Actuarial Services, Inc.<br>&<br>John Does 1-10, ABC Corp 1-10, et al.<br><br>DEFENDANTS | Case No.  2:18-cv-11023-JLL-JAD<br><br><br>Judge: Hon. Jose L. Linares<br><br><br><br>BRIEF IN SUPPORT OF<br>PLAINTIFF'S OPPOSITION<br>TO DEFENDANT'S MOTION<br>TO DISMISS (ECF #53)<br><br>AND<br><br><br><br>IN SUPPORT OF<br>PLAINTIFF'S MOTION TO<br>AMEND  ("SAC") |

**TABLE OF CONTENTS**

Preliminary Statement..........................................1

**I.** PRE-SUIT FRAUD COVERING THE PERIOD OF
NOVEMBER 2012 THROUGH MARCH of 2014............................4

**II.** POST-SUIT LITIGATION-BASED FRAUD COVERING THE
PERIOD OF MARCH 2014 THROUGH PRESENT; PLEADINGS

TO DISINHERIT, THE TORT OF FRAUDULENT CONCEALMENT
(PROPOSED SECOND AMENDED COMPLAINT)...........................6

    **(1) Post-Suit Fraud:  Fraudulent Concealment by
Fabian, Gold, And Mr. Howard, from 2014 to
present, including submission of fraudulent
employment agreement in 2017 and 2018 to
Mask the Payroll Fraud**...................................7

    **(2) Pleadings to Disinherit in August 2017
and October 2018**.........................................11


**III.** Damages Generally........................................13

**IV.** Allegations As to the RICO Enterprise in General, Purpose,
Parties, Predicate Acts......................................15


    **Predicate Act I:** 400K Bank Fraud Immediately After
Decedent's Passing; Sun National Bank Fraud Lawsuit on June
25, 2013 ...............................................17

    **Predicate Act II(a):** June 27, 2013 "Crisis Meeting" as a
Result of Sun National Bank Fraud Lawsuit; Conspiracy to
Commit 250K Bank Fraud in 2013 by Concealing Fabian's 602K
indebtedness  .........................................17

    **Predicate Act II(b):** June 27, 2013 "Crisis Meeting"
Extortion of Plaintiff to Convince her  to Participate in
Bank Fraud by Forcing her To Execute a  Personal Guarantee
Under False Pretenses  .................................18

    **Predicate Act III:**  Commission or attempted Commission of
250K Bank Fraud Against Wells Fargo et al in 2013,
Concealment of, Inter Alia,  Fabian's Indebtedness Totaling
Nearly One Million Dollars.............................18

    **Predicate Act IV:**  602K Payroll Fraud Admitted by Mr.
Fabian ................................................19

    **Predicate Act V:**  Theft of 401K Funds Valued at 100K.....20

    **Predicate Act VI:**  Post-Suit Litigation Fraud, Pleadings to
Disinherit, Fraudulent Concealment.......................21

**Predicate Act VII:**  Use of Toben Investments Inc. as a Shell Company for "No Show  Salaries" And Other Financial Crimes;  Firesale of "Toben" Commercial Property in Early 2014 Resulting in a Loss to Plaintiff Exceeding Three Million Dollars.........................................21

**Additional Predicate Acts,** Rule 10b-5, Thomas S. Howard as a Party, Second Amended Complaint........................22


**V.** State Court Proceedings: The Probate Court's Acceptance of Clearly Frivolous Post-Suit Denials as "Evidence" of No Fraud, and obscure "No Comment" orders which fail to address the fraud. ............................22

**VI.** Standing.................................................23

**A. Proximate Cause, Holmes, Independent Predicate Act Standing**..................................23

**B. Minority Shareholder Status and Derivative Actions, Closely Held Company Exception and Discretion to Treat Derivative Actions as Direct** ...........................25

**VII.** Statute of Limitations and Tolling; Noerr-Pennington

1. Two RICO Conspiracies,  Separate accrual rule...........27

2. Discovery of Injury, Fraudulent Concealment and Duress ..28

3. Wrong Forum Theory.....................................30

4. Noerr-Pennington; Litigation Privilege..................31


**VIII.** 401K Plan 100K Theft; ERISA, Common Law Liability, and Predicate Act V...............................................33

**IX.** Probate Exception.......................................36

**X**. Proposed Seconded Amended Complaint:
SEC 10b-5, Fraudulent Concealment, Breach of
Fiduciary Duty, Aiding and Abetting,  Civil
Conspiracy, and Related RICO Predicate Acts;
Liability of Thomas S. Howard, Esq.;
Addition of Morey La Rue Inc as a party relative
to Predicate Act VII.........................................38

## TABLE OF AUTHORITIES
### (Hyperlinks To Cases in Brief Body)

**Cases**

Annulli v. Panikkar,
200 F.3d 189, 195 (3d Cir.1999)...............................27

Banco Popular N. Am. v. Gandi,
184 N.J. 161, 172-3 (2005)...................................39

Brown v. Brown,
323 N.J. Super. 30 (AD 1999)................................26

Chevron Corp. v. Donziger,
833 F. 3d 74 (2nd Cir. 2016).................................7

Cloer v. Secretary of Health & Human Services,
654 F.3d 1322 (Fed. Cir. 2011)..........................29, 30

Deblasio v. Cent. Metals, Inc.,
2014 WL 2919557 (D.N.J. June 27, 2014)......................36

Donahue v. Rodd Electrotype Company of New England, Inc.,
328 N.E.2d 505 (Mass.1975)..................................26

Donovan v. Mazzola,
716 F.2d 1226, 1235 (9th Cir. 1983).........................36

Eaves v. Penn,
587 F.2d 453, 457 (10th Cir.1978)...........................36

Eli Lilly and Co. v. Roussel Corp.,
23 F.Supp.2d 460, 496 (DNJ 1998)...............................39

Galligan v. Westfield Centre Service, Inc.,
82 N.J. 188 (1980)...........................................30

Garruto v. Cannici,
936 A.2d 1015, 1022 (N.J. Sup. Ct. App. Div. 2007)...........37

Giles v. Phelan, Hallinan 86  Schmieg,  L.L.P.,
901  F.  Supp.  2d 509, 523  (D.N.J.  2012)................31

Giles v. Phelan, Hallinan & Schmieg, L.L.P.,
2013 WL 2444036  (D.N.J. June 4, 2013)....................31,32

Heyman  v.  Heyman,
356  F.  Supp.  958, 964-66  (S.D.N.Y.  1973)...............38

Holmes v. Securities Investor Protection Corporation,
503 US 258 (1992)....................................23, 24, 25

Kennedy-Jarvis v. Wells,
113 F. Supp. 3d 144 (D.C. 2015)..............................37

LoBiondo v. Schwartz,
199 N.J. 62 (2009)...........................................11

Pepe  v.  Gen.  Motors  Acceptance Corp,
254 N.J. Super. 662 (1992)...................................26

Riddell v. Riddell Washington Corporation,
866 F.2d 1480 (DC1989).......................................29

Rotella v. Wood,
528 U.S. 549 (2000)..........................................27

Rosenblit v. Zimmerman,
166 NJ 391, 406-7 (2001) ....................................39

_Scheidt v. DRS Techs_,
424 N.J. Super. 188 (A.D. 2012)................................39

_Sunlight Elec. Contracting Co., Inc. v. Turchi_,
918 F.Supp.2d 392 (E.D. PA, 2013).............................27

_Tully v. Mirz_,
2018 WL 6204908 (A.D. 2018)..................................26

_Williams v. BASF Catalysts LLC_,
765 F.3d 306 (3d Cir. 2014)........................31, 32, 33

_Williams v. BASF Catalysts LLC_,
2016 U.S. Dist. LEXIS 46273(D.N.J. Apr. 5, 2016)..........6, 39

**Statutes and Rules**

FRCP 19(a)................................................16, 40

**Other Sources**

_Richmond, Douglas R., Fraud and Misrepresentation
Claims Against Lawyers (February 5, 2016).
Nevada Law Journal, Vol. 16, 2015_ ...........................40


Ill. Rule 10B-5, 35 Wash. & LeeL. Rev. 799
(1978).......................................................38

## **PRELIMINARY STATEMENT**

In response to defendant's *numerous* references to the state court proceedings (e.g. ECF #50, ECF #53 Certification, Page 1 Defendant Brief), it should be noted that despite five years of litigation, with the exception of a recent monosyllabic and arcane Order referencing "context" without a factual basis, not one Chancery or Appellate Division Judge has <u>directly</u> <u>confronted</u> the rampant fraud in this case, nor have <u>any</u> fact-finding hearings taken place to elucidate the fraud. Procedural anomalies and abstruse "no comment" denials and orders have replaced meaningful fact-finding in the *summary* probate court proceedings, including by the appellate division in a recent thousand-page-appendix interlocutory appeal for the removal of defendant Fabian as executor, denied <u>without comment</u> despite comprehensive briefs. In fact, nearly every trial court order has been "without comment," and it is telling that *every* meaningful application by plaintiff has been <u>denied</u>, not decided for <u>years</u>, and/or *explicitly* deemed "<u>missing</u>" by the Court - the same Court which routinely *summarily* accepts *post-suit* denials by defendants as "evidence" of no fraud, despite overwhelming admissible *pre-suit* proofs and recorded admissions by defendants themselves *repeatedly* and brazenly admitting the systemic fraud.

1

Moreover, six years *ex post facto*, plaintiff has been paid *nothing* from her late husband's multi-million dollar estate. The executor, defendant Fabian, now aims to <u>permanently</u> disinherit her, summarily, without fact-finding, and under false pretenses, in retaliation for her lawsuits and whistleblower activity, as he himself has *repeatedly* admitted - to the apparent satisfaction of the probate Judge.

Plaintiff is a widowed school teacher of *impeccable character*, mother of three adult children, married to one Todd Harris Applebaum ("decedent") for 22 years, until his passing on November 4, 2012. Defendant William P. Fabian, a purported "off the books" business partner of decedent, was appointed executor by way of a last will and testament which bears compelling *indicia* of fraud. Since then, Mr. Fabian and defendants herein have embarked on RICO conspiracy the primary purpose of which is the illicit repayment, through false pretenses, of an undisclosed decades-old "off the books" $602,200.00 indebtedness "evidenced" only by two unsigned sheets of paper whereupon Mr. Fabian *in his role as a purported creditor* wrote, *by hand*, the sums he was allegedly owed.

The will bequeathed 60% of the shares of decedent's profitable multi-million dollar company, *The Todd Harris Company*

2

("**THC**"), to a testamentary trust which six years *ex post facto* has not been funded. Plaintiff and her three children were beneficiaries of the trust in equal shares, for a net ownership by plaintiff of 15% of THC shares or profits through the trust. Decedent's *residuary* estate was bequeathed to plaintiff *only*, and included 40% of THC shares *explicitly* meant to be the property of plaintiff through the residuary clause, and it also included *inter alia* a 51% stake in a company ("Toben") whose sole asset was a profitable million-dollar commercial property, which defendants sold at a "firesale" to satisfy other "off the books" indebtedness allegedly owed Mr. Fabian. **Plaintiff also stood to inherit, outside of probate process, a 401K plan valued at 100K which defendants essentially criminally misappropriated.**

Contrary to defendant's mythology, plaintiff is not an "angry" litigant - she is a victim who witnessed rampant *pernicious* fraud by decedent's former "off the books" business partner which nearly cost her and her children their *entire* inheritance - as depicted *inter alia* by the detailed and brazen colloquy at the (recorded) June 27, 2013 "crisis" meeting. Having witnessed this **pernicious systemic fraud**, she then became a whistleblower, and this was then followed by retaliation and further fraud by defendants, particularly **fraudulent concealment**

after they were sued, as well as two Strategic Lawsuits Against Public Participation ("SLAPP") in the form of pleadings to permanently disinherit plaintiff by selling her minority stake in THC - with the *admitted* goal of forever silencing her and preventing prospective whistleblower lawsuits.

The RICO-based fraud plead in plaintiff's complaint can thus be better understood by bifurcating the fraud into two periods, or two separate RICO schemes for that matter:  the rampant *pre-suit* fraud from November 2012 through March of 2014, and the rampant *post-suit* litigation fraud from April 2014 to present, which consisted primarily of **fraudulent concealment** of defendant's *repeated* pre-suit admissions.    Thus, after the filing of the first lawsuit in early 2014,  in a *modus operandi* which **the State Court below unfortunately has summarily ratified without trial (thus prompting a series of appeals and a recusal motion)**, defendants brazenly doctored *spurious* affidavits which generally and *ambiguously*  sought to deny their own compelling and *repeated* pre-suit admissions of fraud, *infra*, in a clear effort to obfuscate, *post-suit* *and* *ex post facto*, the overwhelming pre-litigation proofs of fraud - in the process forcing plaintiff and the estate of which she is a beneficiary to incur millions of dollars in attorney's fees.

4

The rampant pre-suit and post-suit fraud in the *case sub judice* in fact reasonably renders this case *sui generis*.

## ALLEGATIONS AND LEGAL ARGUMENTS

## I. PRE-SUIT FRAUD COVERING THE PERIOD OF NOVEMBER 2012 THROUGH MARCH of 2014

The two meritorious fraud lawsuits plaintiff filed against defendants are premised on the following compelling *pre-suit* or pre-litigation proofs: **(i)** an independent bank fraud lawsuit filed against defendants in 2013 which nearly resulted in the demise of THC (currently the only estate asset and *de facto* the *entirety* of the estate), [Count I, ¶21-¶29, ¶47-¶60], **(ii)** nearly a dozen hours of recorded admissions in which *inter alia* defendants admitted bank fraud, conspired to commit further bank fraud, and threatened plaintiff with the demise of THC if she did not participate in the conspiracy to commit bank fraud in a bid to "save" the company, [Complaint, ¶9, Count I, ¶73, ¶413-¶414, ¶47-¶60] **(iii)** recorded admissions in which Mr. Fabian brazenly admitted the **payroll fraud**, **§IV *infra***, which resulted in losses exceeding 602K, and which encompassed a weekly 2K payroll payment to Mr. Fabian by THC until his purported "off the books" indebtedness was paid in full, **Id**, **(iv)** admissible business records, such as the minutes of a

December 9, 2012 meeting explicitly ratifying the fraud, and payroll data from 2012 through 2018 depicting same, [Count I, ¶129-¶133] **(v)** the deposition testimony of two bankers who corroborated the bank fraud, which consisted of the knowing concealment of Mr. Fabian's "off the books" 602K, and other, indebtedness allegedly owed him by THC and/or decedent. [Count I, ¶61, ¶110] and **(vi)** Compelling proofs that the "firesale" of the lucrative commercial "Toben" property - which was sold at half of the appraised value of 1.5 million dollars -  was undertaken under false pretenses, resulting in losses exceeding three million dollars. [Predicate Act VII].

**II. POST-SUIT LITIGATION-BASED FRAUD COVERING THE PERIOD OF MARCH 2014 THROUGH PRESENT; PLEADINGS TO DISINHERIT AND THE TORT OF FRAUDULENT CONCEALMENT (PROPOSED SECOND AMENDED COMPLAINT)**

In *Williams v. BASF Catalysts LLC*, 2016 U.S. Dist. LEXIS 46273(D.N.J. Apr. 5, 2016), the Honorable Judge Jose L. Linares stated:

> Here, the complaint alleges[defendants] **engineered** the false statements and evidence in advance of litigation. Then, either directly or through local counsel, [defendants] deployed their prefabricated defense against claimants as they arose. . . . They rigged the game from the beginning. . . . According to the complaint, [defendants] were not mischaracterizing the facts; they were **creating them**.

Ibid. (emphasis supplied).

6

Such is the *status quo* in the case *sub judice*, a *modus operandi* which the probate court essentially ratified, opting to blindly accept spurious post-suit affidavits and other sworn statements which were drafted *specifically* to obfuscate the overwhelming pre-litigation fraud proofs.   Said spurious *post-suit* proofs in fact also consisted of the **creation** of new evidence, as in the case of an **employment agreement** introduced by defendant Fabian after he was sued which its purported drafter, attorney/business consultant Paul Cavise, all but called a fraud.   [**Count I, ¶189-¶198**].   See also Proposed SAC, Count XV.[1]

The litigation fraud thus primarily encompassed **(i)** post suit **fraudulent concealment**, which includes the  acts set forth in Count I, Predicate Act VI, ¶237 to ¶336, SAC Count XV, and **(ii)** the retaliatory pleadings to disinherit plaintiff because of her whistleblower activities, by selling her 40% stake in THC, which pleadings were filed in August of 2017 and October of 2018.

**(1)  Post-Suit  Fraud:    Fraudulent  Concealment  by  Fabian,**

---

[1] It is further respectfully submitted that the rampant litigation fraud in the case *sub judice* can be understood by reference to the landmark RICO lawsuit against a Harvard-educated attorney in Chevron Corp. v. Donziger, 833 F. 3d 74 (2nd Cir. 2016), except that defendants herein sought to take advantage not of a *corporation's* deep pockets, but rather of the perceived weaknesses of plaintiff *school teacher*.

**Gold, And Mr. Howard, from March 2014 to present, including submission of fraudulent employment agreement in 2017 and 2018 to Mask the Payroll Fraud**

As set forth at Count I, Predicate Act VI, ¶237 to ¶336, Count I, ¶482 to ¶486, and as clarified in the proposed SAC Count XV, the post-suit **fraudulent concealment** primarily encompasses: **(i)** two certifications by Mr. Fabian, one in particular dated April 20, 2016, Count I, ¶292-¶295, which purported to deny pre-suit compelling admissions of the payroll fraud, and which were filed in probate Court in August of 2017 and October 2018, **(ii)** a certification submitted by defendant Gold in late 2018 which against overwhelming proofs denied knowledge of the Sun Bank Lawsuit in order to mask his bank fraud - which consisted of *inter alia* the concealment of Fabian's payroll fraud, See Count I, ¶482 to ¶486, **(iii)** As set forth in the proposed SAC, rampant fraud committed by Fabian's attorney, Thomas S. Howard, Esq., in late 2018 which likely resulted in a denial of a thousand-page appendix appeal.

In addition to the foregoing, Mr. Fabian likewise attempted to deny the payroll fraud at his deposition in September of 2017, by stating that he "changed his mind" regarding the payroll fraud - without offering specifics. Count I, ¶368, ¶301-¶304. It is notable that there are minutes dated December

9, 2012 which memorialized the payroll scheme, <u>Count I, ¶133</u>, but there are no such minutes memorializing the "change of mind."

Among the compelling admissions Fabian thus attempted to mask with his deposition testimony are the December 9, 2012 minutes supra, as well as the compelling admission of the payroll fraud he made in August of 2013, setting forth the entire scheme in detail and implicating defendants Gold and Rajs in the scheme. <u>Count I, ¶137</u>. Mr. Fabian in April of 2013 also admitted the payroll scheme and implicated defendant Rajs. <u>Count I, ¶136.</u> On September 4, 2013, he further admitted said fraud in a handwritten missive. <u>Count I, ¶202.</u>

Fabian's April 20, 2016 certification and his September 2017 deposition testimony sought to undermine these compelling proofs. However, particularly disconcerting was that in conjunction with his April 20, 2016 certification he attached "Exhibit 11", a purported "employment agreement" , **<u>Count I, ¶198</u>**, which its purported author, attorney/businessman Paul Cavise, all but called a fraud. **<u>Count I, ¶194.</u>** Mr. Fabian, and his counsel Thomas S. Howard, knowingly introduced said EA, which on its face also bears *compelling* indicia of fraud, **<u>Count I, ¶198</u>**, in an attempt to mask the payroll fraud by arguing,

post-suit, that Mr. Fabian was permitted to work at the company and to draw a salary for *work*, not as repayment of his indebtedness.

Mr. Gold's fraudulent concealment mirrors in some respects (proposed) defendant Thomas S. Howard's latest scheme - to deny the significance of the all-encompassing Sun Bank fraud lawsuit of 2013, in Mr. Howard's case as an attempt to argue that this suit had no bearing on plaintiff's decision to file her own fraud lawsuits. In Mr. Gold's case, as set forth at Count I, ¶482 to ¶486, he falsely denied knowledge of the Sun Bank lawsuit primarily because a Wells Fargo executive at a deposition in early 2018 testified that Mr. Gold, in connection with a THC commercial loan, failed to disclose the existence of the suit, and that same was a material omission, *to wit*, that "it absolutely would have made a difference." Count I, ¶110. Mr. Gold submitted his fraudulent certification denying knowledge of the Sun Bank suit in an attempt to mask his bank fraud at Wells Fargo - which bank fraud per the June 27, 2013 "crisis meeting" had as its goal the concealment of numerous financials related to Mr. Fabian, including his highly disputed 602K debt, as well as a recent 350K debt he incurred with THC in connection with a "bailout", which Mr. Gold falsely represented

10

to Wells Fargo as having been financed by *the Estate*, and not Fabian. Count I, ¶108.


Further instances of fraud by Mr. Howard are set forth at **Counts XIV and XV** in the proposed SAC.

## (2) Pleadings to Disinherit in August 2017 and October 2018

The pleadings to disinherit plaintiff constitutes two state court complaints to sell her 40% minority stake in THC for, literally, fear that plaintiff-school teacher can "destroy" the company. They are essentially SLAPP lawsuits, LoBiondo v. Schwartz, 199 N.J. 62 (2009), and in conjunction with myriad other pre-litigation whistleblower acts[2], they also give rise to

---

[2]    Plaintiff's pre-litigation whistleblower activity is *extensive*. Specifically, *hours* after her husband died, Mr. Fabian started to pay himself a 2k per week THC "salary", and increased defendant Rajs' salary by 50K – one month prior to probating the will, [Count I, ¶18]. As a result, plaintiff became suspicious and began her whistleblower activity by *inter alia* **recording all meetings with defendants**, starting in or about April 2013. [Count I, ¶136]. Sun National Bank on June 25, 2013 then sued the estate, Rajs, and Keh, for **fraudulent transactions totalling over 400K.** [Count I, ¶21]. The pivotal **crisis meeting** was held two days later on June 27, 2013, and was likewise **recorded** by plaintiff with defendant's consent. [Count I, ¶47 et seq]. Following this emotional and fraud-laden crisis meeting, wherein plaintiff was asked and refused to commit fraud, in or about **August of 2013 plaintiff confronted Mr. Fabian with her attorney, and demanded details regarding his payroll fraud,** which he readily admitted. [Count I, ¶137]. On September 4, 2013 plaintiff discovered for the first time that Mr. Fabian was seeking to be fraudulently paid circa 602K dollars, which was evidenced *only* by two unsigned sheets of

a comprehensive whistleblower claim as they are frivolous and "sham litigation". [CEPA COUNT IV, ¶76 to ¶99].

The pleadings were filed in August of 2017 and October of 2018, and they were generally premised on two arguments:  **(i)** that plaintiff can literally "destroy" THC by committing a series of acts set forth the the "affiant affidavits" of May 2014, which acts include a "staring" incident and myriad protected whistleblower activities [Count IV, ¶48-58], Count I, ¶427, ¶89-¶92, ¶466] and **(ii)** that plaintiff has a propensity to file minority oppression lawsuits, although she's never filed any, and as such can "destroy" the company if she is allowed a 40% stake in the company. [See e.g., Count IV, ¶70, ¶85].

To be sure, as the complaint shows plaintiff was *repeatedly* promised a 40% stake in the company prior to filing suit, [**Count IV, ¶81-¶82**],  a stake her husband specifically wanted

---

paper. [Count I, ¶202] Following the August 2013 meeting, in a clearly retaliatory action meant to frighten plaintiff, in December of 2013 **plaintiff was discharged** from her husband's company for *alleged* insubordination, and escorted **by the police**, in the presence of Gold, Fabian, and Capece. [Count I, ¶427, and Count IV, ¶22-36].    Plaintiff then filed suit in late March 2014, and in or about May 2014 the "**affiant defendants**" prepared affidavits in which they claimed *inter alia* that plaintiff was "**digging for dirt**" and that she changed the gas-receipts policy (a fraud curbing measure).  [Count IV, ¶48-58], Count I, ¶427, ¶89-¶92, ¶466].   The affidavits, which also suggested plaintiff could "destroy" the company by merely "**staring**" at the company men, were meant to justify the firing - but in doing so they admitted whistleblower animus. Id. and [Count I, ¶427].

her to own, Id., and it was not until after the suit was filed that she was threatened with disinheritance, having been disinherited for six years as she has received nothing from her husband's estate since he passed. [Count I, ¶241]

Nonetheless, defendant Fabian, and his attorney Thomas S. Howard, filed pleadings in August 2017, and then again in October of 2018, after the Federal Complaint was filed, to disinherit plaintiff. The October 2018 pleadings were particularly worrisome and fraudulent for two reasons: **(i)** they specifically referred to the Federal Complaint as the "best evidence" to disinherit plaintiff,[Count IV, ¶86-¶87], and **(ii)** Mr. Howard filed those pleadings, which were also based on the "affiant affidavits" of May 2014 indicating they could not get along with plaintiff [Count I, ¶89-¶92, ¶466], *notwithstanding* that in September of 2017 Mr. Fabian in a lengthy colloquy specifically identified *all* of the affiants and said that they would have no objection to plaintiff being at THC. Proposed SAC, Count XV, ¶40.

## III. Damages Generally

The **damages** sought by plaintiff are based on her status as the *only* beneficiary of the *residuary* estate (51% of Toben and its commercial property and profits, 40% of THC shares and its

profits, et al.),   and as a 15% beneficiary of a testamentary trust[3].  She also seeks extensive litigation-fraud based damages which are nearly two million dollars to date.    The damages include, but are not limited to:  **(i)** damages she has suffered for the past six years in the form of monies denied her from the estate, stemming from defendant's ongoing efforts to curtail her whistleblower lawsuit(s) by strangling her financially, [Count IV, ¶97] **(ii)** damages in the form of attorneys fees paid by her and the estate, **totalling nearly two million dollars**, stemming from defendant's efforts to curtail her whistleblower lawsuits through rampant litigation-based fraud, [Count I, ¶228] **(iii)** damages stemming from the "firesale" of the profitable million-dollar "Toben" commercial property, resulting in losses of ***over three million dollars*** [Count I, ¶400] **(iv)** damages stemming from the theft by defendants of 401K plan funds valued at 100K which were the property of the plaintiff ***outside of the probate process,*** [Count IV, ¶443]     **(v)** damages stemming from the loss of decedent's 600K yearly profits in THC, as well as

---

[3] Decedent's will essentially only bequeathed only one asset - 60% of THC shares to a testamentary trust with four beneficiaries, including plaintiff. [Count I, ¶16]  "Everything else" was plaintiff's, and "everything else" in fact included 40% of the shares of THC, which her late husband explicitly wanted her to inherit, albeit by way of the residuary clause of the will, and there is nothing in the record which would suggest he wanted her completely disinherited as defendants have done. [Count I, ¶17]

the payment by Mr. Fabian to himself of various questionable "off the books" debts, including the 602K debt he paid himself on the payroll of THC, [Count I, Predicate Act IV] and **(vi)** damages stemming from the plaintiff's whistleblower activities, which commenced in late 2012 as a result of financial irregularities, and which increased following the nearly-catastrophic Sun National Bank lawsuit in mid-2013, said whistleblower activity resulting in the discharge of plaintiff from THC in December of 2013, and her being escorted from THC premises *by the police*. [See **Count IV**].

## IV. Allegations As to the RICO Enterprise in General, Purpose, Parties, Predicate Acts

The purpose of the RICO enterprise, payment of various debts allegedly owed Mr. Fabian, particularly the disputed 602K debt, can be readily discerned from the entirety of the proofs. However, one comment Mr. Fabian made at the pivotal "crisis meeting" of June 27, 2013, convened as a result of a nearly catastrophic lawsuit by Sun Bank, sets forth explicitly in Mr. Fabian's own words the purpose of the RICO scheme, to wit, Mr. Fabian's statement on June 27, 2013 that "*if I drop dead, you know, I expect my family to be paid*." Proposed Second Amended Complaint ("SAC"), Preliminary Statement ¶9.

The parties to the RICO scheme are set forth in the first

amended complaint's general allegations, ¶61 to ¶99, and they also include Mr. Fabian's current counsel, Thomas Howard, Esq., as set forth in the SAC, §X herein.

Their various roles are set forth throughout the comprehensive RICO complaint, Count I, and a detailed summary of their respective roles appears in the SAC, **Count XV**.(Fraudulent Concealment) and **Count XIV** (Aiding and Abetting).

As set forth at §VII, Statute of Limitations, the RICO conspiracy can be bifurcated into two periods:  the rampant *pre-suit* fraud from November 2012 through March of 2014, and the rampant *post-suit* litigation fraud from April 2014 to present, which consisted primarily of **fraudulent concealment** of defendant's *repeated* pre-suit admissions.

The suit includes seven predicate acts, covering the period of 2012 through present (including litigation fraud through mid-2018), as well as the proposed SAC, which adds an additional predicate act based on violations of Rule 10b-5 in reference to the fraudulent sale of plaintiff's 40% in THC, as well as additional litigation-based fraud allegations to Predicate Act VI, which covers the period of mid-June 2018 through present. The proposed SAC identifies with clarity the role of Mr. Fabian's counsel, **Thomas S. Howard**, as a FRCP 19(a) necessary

16

party.  **The required Rico injuries to property or business are set forth inter alia at** <u>Count I, ¶476-¶480</u>.  See also <u>Section III</u> herein.

**Predicate Acts**

**Predicate Act I**, concerns the fraudulent withdrawal by defendants Keh and Rajs, of 400K from Sun National Bank after decedent died in late 2012, which led to a fraud lawsuit against them *and the Estate* on June 25, 2013, and subsequently to the June 27, 2013 "crisis" meeting, <u>infra</u>, Predicate Act II(a).

[<u>Count I, ¶18-¶46</u>**]**

**Predicate Act II(**a**)**, refers to a June 27, 2013 "crisis" meeting wherein defendants openly discussed a fraud conspiracy, defendant Fabian admitted to having committed fraud at Sun Bank in 2010 by concealing his debts[4], and he also made it clear that the debts allegedly owed him would be concealed from the world, e.g. "**we are not reporting anything to anyone at the end of the**

---

[4] At a deposition in early 2018, a Sun Bank executive confirmed that the 2010 bank fraud took place and that Mr. Fabian's "off the books" financials were in fact concealed from the bank. [<u>Count I ¶61</u>]  The concealment (bank fraud), was in accord with the goals of the RICO enterprise, to conceal Mr. Fabian's "off the books" debts to assure he is repaid for same.  Moreover, the <u>payroll fraud</u> constitutes further evidence of Mr. Fabian's intent to conceal his questionable "off the books" financials. The <u>litigation fraud</u>, wherein he attempted to conceal the payroll fraud by inter alia introducing a fraudulent employment agreement, further evidences the scheme he set forth on June 27, 2013.

**day**" [Count I ¶73, ¶414, ¶47-¶91].  In essence, this crisis meeting set the goals and tenor of the RICO conspiracy - payment of his debts, and concealing same from the world.  Id.  This meeting was attended by defendants Gold and Capece, although Gold in an affidavit in late 2018 would subsequently fraudulently deny same [Id.] *and* [Count I, ¶482 to ¶486 and Section II].

**PREDICATE ACT II**(b)[5], which can be considered a separate predicate act, concerns the June 27, 2013 "crisis meeting", wherein defendants in addition to discussing fraud also made alarming comments regarding the impending doom of THC, in a clear effort to compel plaintiff to commit bank fraud by executing a personal guarantee under false pretenses, e.g., **"it's sink or swim time."**  [Count I, ¶416, and ¶47 to ¶91]. They also attempted to *frighten* her  into providing them with "bailout" money exceeding 350K in order to save the company from the Sun Bank fraud lawsuit,  Id.,  and *inter alia* they suggested that she tap into her teacher's pension fund. [Count I, ¶98].

**PREDICATE ACT III**, [Count I, ¶92 to ¶121], encompasses the attempted execution of the bank fraud they discussed on June 27,

---

[5] Although included within the same predicate act because they both occurred on June 27, 2013, Predicate Acts II(a) and II(b) essentially constitute two distinct predicate acts, conspiracy and extortion.

2013, and which they attempted to execute in or about October 2013 by concealing from Wells Fargo:   **(i)** Mr. Fabian's disputed 602K debt, **(ii)** a 350K Promissory Note by THC to Fabian for monies he *personally* loaned THC to pay Sun Bank directly, [Count I, ¶487], and **(iii)** the Sun Bank Fraud lawsuit. [Count I, ¶21 et seq].   Thus, Mr. Gold in soliciting the loan from Wells Fargo inter alia misinformed the bank that the source of the 350K bailout funds *was the Estate*, when in reality the source was Mr. Fabian personally. [Count I, ¶108 et seq]. At a deposition in early 2018, a Wells Fargo executive confirmed that these items had been concealed, and he further **made it crystal clear that the non-disclosure of the Sun Bank lawsuit by Mr. Gold was material and significant.**   [Count I, ¶109 to ¶110].

**Predicate Act IV**, the $602,200.00 payroll fraud, [Count I, ¶122 to ¶228], began with Mr. Fabian's 2k weekly payroll payments, commencing instantaneously upon the passing of decedent, *infra*.   Id. The weekly payroll payments were formally ratified or sanctioned at a December 9, 2012 board meeting[6] ,[Count I, ¶132 to ¶133].   However, it was not until August of

---

[6] There are no subsequent board meeting minutes vacating this fraudulent payroll scheme - although the executor fraudulently claimed at his Sept 2017 deposition that he "changed his mind" at some point in time regarding this payroll scheme.

2013, after plaintiff's whistleblower activities began in earnest, that Mr. Fabian at a meeting with plaintiff's attorney set forth the *specifics* of the said payroll fraud, candidly admitting that he wasn't *working* for the payroll payments, they were actually in repayment of debts allegedly owed him. [Count I, ¶137].   Following this meeting, on September 4, 2013 for the first time he produced his "proofs" of the amounts owed which consisted of a handwritten cover page in a "sticky note", which claimed a total amount owed of $602,200.00 minus deductions for *payroll payments he had already received.* [Count I, ¶200 to ¶205].   Accompanying that "sticky note" cover letter, was the unremarkable "proof" of the indebtedness totalling nearly a million dollars,  to wit, two unsigned decades-old handwritten sheets of paper.   [Count I, ¶200].   In his answers to interrogatories, Mr. Fabian admitted that he did not engage in the payroll fraud in the year 2011, because THC was under IRS Audit. [Count IV, ¶108].

**Predicate Act V -Count I, ¶229 to ¶236,** encompases the outright theft, in April of 2013, of 401K funds valued at $100,000.00 which were the property of plaintiff outside of probate, as decedent's surviving spouse. See Erisa Section VIII.

20

This predicate act fits in the RICO scheme in that it financed the Estate and/or THC's operations to keep afloat the payroll fraud *supra*.

**Predicate Act VI -** litigation fraud, essentially consists of **fraudulent concealment,** followed by or in conjunction with **fraudulent pleadings** to disinherit plaintiff in August of 2017 and October of 2018.  [Count I, ¶237 to ¶334]. See §II herein, for a succinct summary of same.

**Predicate Act VII,** involves the  Toben Investments shell company, owned 51% by plaintiff, and the firesale of its sole asset, a commercial property valued at 1.5 million dollars - which sold for *half* of that amount *shortly after plaintiff filed suit* in order to satisfy various "off the books" debts allegedly owed to Mr. Fabian.  [Count I, ¶337 to ¶401].  Plaintiff's **losses exceed $3 Million dollars in capital and lost profits.** [Count I, ¶400],  Specifically, the Toben entity was used as a shell company for **fraudulent no show salaries** and the its sole asset, a lucrative commercial property,  was sold under false pretenses at *half* of the *recently appraised* value of 1.5 million dollars,  [Count I, ¶391],  immediately after plaintiff filed suit.  Mr. Fabian in effecting the sale claimed that the property had extensive environmental damage, when in fact the

property had been cleared by the New Jersey environmental protection agency, [Count I, ¶393]. Further, the environmental report of contamination relied upon by Fabian for this fraudulent sale merely indicated the lack of documentation, it was not a substantive finding of contamination. [Count I, ¶394-5]. Nonetheless, Mr. Fabian in April 2014 sold the property *to his business acquaintances* - the tenants of the property, primarily to satisfy his own "off the books" indebtedness, which in the case of the Toben property included (but was not limited to) a mortgage owed to a company called "***Morey La Rue***", which was effectively *de facto* owned by Mr. Fabian. [Count I, ¶388, Complaint, ¶42].

As set forth at §X, plaintiff proposes **additional predicate acts** in a a SECOND AMENDED COMPLAINT ("SAC"), which encompass the addition of **Thomas Howard, Esq.** as a key RICO participant relative the the litigation fraud, as well as a new predicate act premised on R. 10b-5 and the "de facto seller" theory - given plaintiff's status as a beneficiary of 40% of the shares and the fraudulent sale, or attempted sale, of same by the Mr. Fabian and Mr. Thomas Howard, Esq.

**V. State Court Proceedings: The Probate Court's Acceptance of Post-Suit Denials as "Evidence", Recusal Motion, "No Comment" orders, Fraudulent Concealment by Thomas S. Howard, Esq.**

As defendant has chosen to comment on the state litigation, by referencing appeals in a letter (ECF #50), and in his preliminary statement and by submitting the the State Court complaint as an exhibit, the undersigned hereby submits the following documents  and respectfully requests that the within motion not be converted into summary judgment: **(i)** plaintiff's appellate court brief **(ii)** plaintiff's motion for the recusal of the state court judge **(iii)** appellate submission by Thomas S. Howard Esq showing brazen fraudulent concealment as set forth at **SAC Count XV**, **(iv)** the resulting appellate division's "no comment" denial dated January 15, 2019, and (**v**) a 2018 certification signed by Mr. Howard, in which he brazenly denies the Sun Bank lawsuit was ever filed (**fraudulent concealment**). **Items (v) and (iii) are attached as exhibits to the proposed SAC Count XV**.

## VI. Standing

A. Proximate Cause, Holmes, Independent Predicate Act Standing

Defendant primarily relies on the seminal Holmes v. Securities Investor Protection Corporation, 503 US 258 (1992) case for the erroneous proposition that the since plaintiff has not met the standing requirements for a *derivative* shareholder cause of action, under Holmes she also lacks standing for any

and all RICO predicate acts, particularly as it relates to the payroll fraud issue.   He does not address RICO standing as regards the other predicate acts, such as the theft of the 401K funds valued at 100K, which funds were the property of plaintiff outside of probate, or the sale under false pretenses of the lucrative Toben commercial property, with damages exceeding three million dollars in lost profits and capital.

Defendant's argument is therefore infirm factually as well as legally.   First, Holmes specifically left unresolved issue of whether plaintiffs must *independently* meet the standing requirements of the individual predicate acts - *in addition to* meeting the RICO "proximate cause" criteria.   However, Justice O'Connor's concurrence in Holmes, which has been cited with approval in other circuits,  was clear in that plaintiffs only need to meet the federal "Proximate Cause" standard set forth in Holmes,  and not the individual standing requirements of the predicate acts:

> I agree with the Court that [RICO] has a proximate cause element.... In my view, however, before deciding whether the [plaintiff] was proximately injured by [defendant's] alleged activities, we should first consider the standing question that was decided below...In resolving that question, I would hold that a plaintiff need not be a purchaser or a seller to assert RICO claims predicated on violations of fraud in the sale of securities.

Holmes, 502 US at 277.    As such, it matters not if plaintiff is a shareholder, or whether she can file a derivative or a minority oppression suit, the only test that needs to be met is the Holmes "Proximate Cause" test.

The second flaw in defendant's reliance on *Holmes'* to support his argument that there is no proximate cause ("PC"), is that it can be distinguished. Specifically, the *Holmes* plaintiff SIPC had no contractual relationship with defendant Holmes, and Holmes certainly owed no duties to SIPC.  In the case at bar, defendant Fabian as executor certainly owed plaintiff numerous duties, including of course a fiduciary duty as executor of the Estate.  **For this reason alone, plaintiff meets the "proximate cause" requirements of Holmes.**[7]

B. Minority Shareholder Status and Derivative Actions, Closely Held Company Exception and Discretion to Treat Derivative Actions as Direct

Assuming *arguendo* that RICO standing requires that plaintiff meet the standing criteria for a derivative action or a minority oppression action, the case law is clear in that New Jersey courts follow the "closely held" corporation exception,

---

[7] Further, as the *Holmes* Court found that plaintiffs need not meet R. 10b-5's standing criteria, the proposed second amended complaint, R. 10b-5 Predicate Act, is not devoid of standing.

and afford judges the **discretion** to treat derivative actions in closely held companies as **direct actions**. _Tully v. Mirz_, 2018 WL 6204908 (N.J. Super. Ct. App. Div. Nov. 29, 2018)[8]. Other jurisdictions following this "closely held" exception consider _all_ such shareholder actions to be **direct**. See, e.g., Donahue v. Rodd Electrotype Company of New England, Inc., 328 N.E.2d 505 (Mass.1975). The case relied upon by defendant, _Pepe v. Gen. Motors Acceptance Corp_, 254 N.J. Super. 662 (1992), is thus inapposite because it entails a large corporation, not a closely held family business. Id.

In the seminal Brown v. Brown, 323 N.J. Super. 30 (AD 1999), cited in _Tully_, the Court set forth the bases for treating derivative claims as direct in closely held company actions:

> Comment (e) to [Principles of Corporate Governance: Analysis and Recommendations, § 7.01 (d)] recognizes that as to closely-held corporations, "the normal policy reasons for requiring a plaintiff to employ the form of the derivative action may not be present or will be less

---

[8]The _Tully_ Court thus held: "In the context of a closely-held corporation, courts have discretion **to construe a derivative cause of action as a direct claim if doing so** "will not **(i)** unfairly expose the corporation or the defendants to a multiplicity of actions, **(ii)** materially prejudice the interests of creditors of the corporation, or **(iii)** interfere with a fair distribution of the recovery among all interested persons." [citations omitted] Ibid. **It is respectfully submitted that whether or not plaintiff's claim meets this criteria is better suited for summary judgment or trial**.

weighty, even though the action alleges in substance a corporate injury." The comment recognizes that "the concept of a corporate injury that is distinct from any injury to the shareholders approaches the fictional in the case of a firm with only a handful of shareholders." *Id.* Comment (e) also cites *Watson v. Button,* 235*F.*2d 235 (9th Cir.1956), for the proposition that "the usual policy reasons requiring an action that principally alleges an injury to the corporation to be treated as a derivative action are not always applicable to the closely held corporation."
Ibid.

## VII. Statute of Limitations and Tolling; Noerr-Pennington

### 1. Two RICO Conspiracies,  Separate accrual rule

For purposes of the statute of limitations it is respectfully submitted, first, that the "separate accrual" doctrine, *Annulli v. Panikkar,* 200 F.3d 189, 195 (3d Cir.1999)[9], permits this court to bifurcate the RICO conspiracy into two separate conspiracies:  the rampant *pre-suit* fraud from November 2012 through March of 2014, and the rampant *post-suit* litigation fraud from April 2014 to present, which consisted primarily of

---

[9] Although this point has not been settled by the Supreme Court, at least one Court has found that *Annulli's* "separate accrual rule" survived the seminal *Rotella* Supreme Court decision regarding the RICO statute of limitations.  See, e.g., Sunlight Elec. Contracting Co., Inc. v. Turchi,., 918 F.Supp.2d 392 (E.D. PA, 2013) (finding that Annulli's "separate accrual rule" survived the seminal *Rotella v. Wood,* 528 U.S. 549, (2000)decision.)

**fraudulent  concealment**  of  defendant's  *repeated*  pre-suit admissions.

The  *Annulli*  Court  described  the  separate  accrual  doctrine as follows:

> Plaintiffs  in  civil  RICO  actions  may  seek  redress  for *new*  injuries  arising  out  of  *new*  predicate  acts  that  occur within  the  statutory  period,  even  if  those  new  predicate acts  and  resulting  injuries  arise  out  of  the  same  pattern of  racketeering  behavior  that  began  outside  the  four-year statutory  period.  ....under  the  "separate  accrual"  rule ...plaintiffs  could  recover  for  new  predicate  acts occurring  within  the  statutory  period  if  they  could  show that  the  new  acts  could  have  caused  them  harm  over  and above  the  harm  that  the  earlier  acts  caused..

Id.

For  the  reasons  set  forth  at  **Count I, ¶455 to ¶462**, §II, Post-Suit  Litigation  Fraud,  and  SAC  Count  XV,  it  is respectfully  submitted  that  plaintiff  could  recover  under  RICO for  the  new  predicate  act  of  litigation  fraud,  which  began  with the  formal  filing  of  frivolous  affidavits  circa  August  of  2017, See  SAC  Count XV,  and  which  continues  unabated  to  date.   This fraud  has  generated  over  one  million  dollars  in  damages  in  the form  of  attorneys  fees,  which  are  paid  by  the  Estate  of  which plaintiff  is  a  beneficiary.   Moreover,  but  for  this  fraud, plaintiff  would  have  recovered  for  the  entirety  of  her  losses  in State Court.

## 2. Discovery  of  Injury,  Fraudulent  Concealment  Tolling  and Duress

The primary methods of equitable tolling for federal causes actions are **duress,** *Cloer v. Secretary of Health & Human Services,* 654 F.3d 1322 (Fed. Cir. 2011), "**extraordinary circumstances**", Ibid, and in RICO actions particularly **fraudulent concealment,** Riddell v. Riddell Washington Corporation, 866 F.2d 1480 (DC1989). **In the case at bar**, allegations related to plaintiff's discovery of the RICO injury (set forth at COUNT I, ¶476 to ¶480), as they relate to tolling the RICO statute of limitations because of **fraudulent concealment and duress**, can be found at Count IV, §443 (duress), Count I, ¶402 to ¶441 (fraudulent concealment and duress), and Proposed SAC Count XV (Fraudulent Concealment Tort). Moreover, the degree of due diligence required by plaintiff after she discovered the injury or the fraudulent concealment is set forth in the allegations at Count I, ¶448 to ¶454.

Those allegations essentially set forth that plaintiff was disinherited for the past six years, she was threatened at the June 27, 2013 crisis meeting and was invited to commit fraud "or else", and post-litigation she was threatened with disinheritance *specifically* because of her lawsuit. In October 2018, in fact, counsel for Mr. Fabian, proposed defendant Thomas

S. Howard, specifically referenced the federal court complaint as a reason to permanently disinherit plaintiff - in the process making it clear that the **purpose of their pleadings is to prevent plaintiff from disclosing their fraud.**   <u>Count I, ¶484</u>

### 3. Wrong Forum Theory

As to the RICO claim, it is respectfully submitted that the primary ways to toll the statute of limitations are duress and fraudulent concealment, *supra*.   It is nonetheless submitted that the statute for the RICO claim can be equitably tolled because of the "wrong forum" (probate court) under the federal "extraordinary circumstances" tolling doctrine.   *Cloer v. Secretary of Health & Human Services,* 654 F.3d 1322 (Fed. Cir. 2011).

As to the state claims, in *Galligan v. Westfield Centre Service, Inc.,* 82 N.J. 188 (1980), the Court allowed the tolling of the statute where plaintiff filed the first complaint "in a court which lacks subject matter jurisdiction over the case" if, "in the *particular circumstances* of the case, the purposes underlying the statute are not compromised." *Id.* at 195 (emphasis supplied).

In the case at bar, as stated in the complaint, the probate court has no subject matter jurisdiction to entertain RICO

and/or ERISA claims - the Court  is generally limited to breach of fiduciary duty claims, and cannot award treble or punitive damages.   As such, the plaintiff's filing of the probate cause of action in March of 2014, tolled the statute for the federal claims ("extraordinary circumstances") and the state claims (no subject matter jurisdiction).

**4. NOERR-PENNINGTON/Litigation Privilege  (SECTION VII)**

First, the 3rd Circuit has expressly found that the **litigation privilege does *not* bar state law fraud claims.** *Williams v. BASF Catalysts LLC, 765 F.3d 306 (3d Cir. 2014)*.  In "Giles 2", infra, *Giles v. Phelan, Hallinan & Schmieg, L.L.P., 2013 WL 2444036  (D.N.J. June 4, 2013)* this Court further held that the **litigation privilege does not bar RICO actions.**

Second, defendant cites to a 2012 case which pre-dated the 3rd Circuit's 2014 Williams case, *Giles v. Phelan, Hallinan 86 Schmieg, L.L.P., 901 F. Supp. 2d 509, 523 (D.N.J. 2012) (hereinafter "Giles 1"),* in support of the proposition that the litigation privilege bars the State claims herein. In *Giles 1*, this Court  essentially found the litigation privilege protects *statements* made during litigation  but in so it refused to decide whether the **litigation privilege** also barred the **RICO claims.**  More importantly, it barred a *Consumer Fraud* action

which is unlike the claims in the case sub judice, and it pre-dated the 3rd Circuit's 2014 *Williams* case, which made it crystal clear that **fraud claims are not protected by this privilege.** *Williams v. BASF Catalysts LLC,* 765 F.3d 306 (3d Cir. 2014) ("**But New Jersey's Supreme Court has never recognized the litigation privilege to immunize systematic fraud, let alone fraud calculated to thwart the judicial process.**")

Moreover, subsequent to "*Giles 1*", this Court in 2013 decided "*Giles 2*", *Giles v. Phelan, Hallinan & Schmieg, L.L.P.,* *2013 WL 2444036 (D.N.J. June 4, 2013).* In this case, this Court resolved issue regarding RICO and the litigation privilege and held that the **litigation privilege did not bar the RICO action**, but that Noerr-Pennington *did*. *Giles 2* also set forth two propositions: **(i)** Noerr-Pennington's sham litigation exception was applicable in RICO actions and **(ii)** even if the "sham litigation" is *successful*, i.e. if defendants prevail, this does not foreclose a finding in *federal court* that the litigation was nonetheless a sham, *to wit*, "**[t]o be clear, the Court is not holding that any favorable disposition in prior court proceedings guarantees that the Noerr-Pennington doctrine will apply** ". *Giles 2, at 5*

*Giles 2* further held that, to invoke the sham litigation exception, "*the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits …[and] the litigant's subjective motivation must conceal an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the governmental process—as opposed to the outcome of that process….To fall within this exception, a lawsuit "must be a sham both objectively and subjectively*". Id.

As such, it is clear in the case at bar **(i)** that *none* of the RICO fraud claims set forth at Predicate Act VI are barred by the litigation privilege, *Giles 2 supra* (2013), **(ii)** that none of the state law fraud claims, including the proposed state law claim SAC Count XV (Fraudulent Concealment), are barred by the **litigation privilege**, Williams, *supra* (3rd Cir 2014) (**iii**) although the Noerr-Pennington doctrine *may* bar the RICO cause of action, it is subject to the "sham litigation exception". *Giles 2 supra* (2013). **In the case at bar, however, the compelling facts depicting the sham nature of defendant's litigation can be found at Count I, ¶465-¶475 and more specifically at SECTION II(2) of this brief.**

**VIII. 401K Plan 100K Theft; ERISA, Common Law Liability, and Predicate Act V**

The late Todd Harris Applebaum ("decedent") on the day of his passing was a participant in a 401(K) plan with John Hancock Financial Services, valued at approximately 100K, which defendants Fabian and Keh, through false pretenses, misappropriated. **Count I, RICO, Predicate Act V, ¶229.** As decedent's surviving spouse, plaintiff was entitled to the full value of the policy unless she signed an express waiver of rights, which she did not. **Count I, RICO, Predicate Act V, ¶230.**

Despite plaintiff's *unsuccessful* efforts to locate the 401K policy documents immediately after the passing of her husband in November 2012, defendant Rajs promptly began the process of transferring or rolling over said 401K policy from John Hancock to ING ("Voya Financial, Inc.") **Count I, RICO, Predicate Act V, ¶231.** John Hancock at the time of this transfer was not notified that decedent had passed. **Count I, RICO, Predicate Act V, ¶232.** In early April of 2013, defendant Fabian as executor, and defendant Keh, *through false pretenses*, then caused the said 401K funds, which were the property of the plaintiff and not subject to the probate process, *to be paid to the Estate*, as depicted by the graphic at **Count I, RICO, Predicate Act V, ¶233.**

Specifically, in a nine page fax dated April 3, 2013,

third party administrator Intac forwarded to ING ("Voya") decedent's death certificate, which included plaintiff's name and *clearly identified her as the spouse of Todd Harris Applebaum*. **Count I, RICO, Predicate Act V, ¶234.** Also included in that facsimile was an ING death benefit form *signed by Fabian as executor* on 4/1/2013, and a certification which was signed by *Cecilia Keh on 4/1/2013, and which authorized disbursement of the 401K proceeds to the Estate under false pretenses*. **Count I, RICO, Predicate Act V, ¶235.** Intac authorized the disbursement as a "third party administrator". **Count I, RICO, Predicate Act V, ¶236.**

If not outright fiduciaries by virtue of the duties owed to plaintiff as executor et al, Fabian and/or Keh are thus liable as non-fiduciaries for **aiding and abetting** under ERISA pursuant to the seminal New Jersey case  of <u>Pension Fund—Local 701 v. Omni Funding Group</u>, 31 F. Supp. 161 (D.N.J. 1990).  In that case, the Court thoroughly discussed existing precedent, legislative history, and splits among the circuit courts to arrive at its conclusion that in New Jersey, a non-fiduciary is liable under ERISA §409[10]:

---

[10] ERISA § 409 provides that "*Any person who is a fiduciary ...who breaches any of  the responsibilities...imposed upon fiduciaries ...shall be personally liable ...*"

This Court .... concludes that **ERISA does provide a remedy against non-fiduciaries acting in concert with fiduciaries**. ERISA is a comprehensive remedial statute designed to protect the interests of participants and beneficiaries of employee benefit plans. Eaves v. Penn, 587 F.2d 453, 457 (10th Cir.1978)..Accordingly, **ERISA should be liberally construed in order to carry out its remedial purposes**. Donovan v. Mazzola, 716 F.2d 1226, 1235 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984)..**ERISA's broad remedial provisions as codified in § 1132, as well as the statute's legislative history, suggest strongly that Congress intended ERISA to federalize the common law of trusts. It is undisputed that under the common law of trusts, a beneficiary may seek relief from a non-fiduciary acting in concert with a fiduciary**. *See* Restatement (Second) of Trusts at § 326 (1959).

Id at 178.   (emphasis supplied). The proposed Second Amended Complaint ("SAC") contains amendments to clarify Count VI, ERISA, aiding and abetting liability of Fabian and Keh.[11]

## IX. Probate Exception

---

[11] Defendant relies on the case of Deblasio v. Cent. Metals, Inc., 2014 WL 2919557 (D.N.J. June 27, 2014) for the proposition that the "preemption provisions of ERISA bar *any* state law claim alleging a failure to distribute any plan benefits". The *DeBlasio* Court, however, failed to dismiss the state law claims based based on **express preemption** and **complete preemption** doctrines since, it reasoned, a prerequisite to preemption was plaintiff's ability to file under Erisa § 502(a)(1)(B). Id. It further held that preemption is an **affirmative defense** which may require additional fact-finding. Ibid. As such, the Court concluded that plaintiff was not required to plead the lack of preemption, and that it "*cannot determine based on the Complaint alone whether the Policy constitutes an ERISA plan…[a]t a minimum, the Court must have the Policy itself*." Ibid. As in *DeBlasio*, in the case at bar plaintiff does not have the 401K Plan documents, and for this reason **Count V**, *State 401k Law Claims*, should not be dismissed. (Note: The proposed SAC contains an amendment to **Count VI**, ERISA, which states that the Voya/ING plan *may* be an ERISA plan).

36

## **Probate Exception as To Fraud Claims**

The case of Kennedy-Jarvis v. Wells, 113 F. Supp. 3d 144 (Dist. of Columbia 2015) involved a case which had been stagnant in the New Jersey Probate Court for six years.   In noting that the probate exception did not bar the claims, the Court stated that "personal tort claims against estate administrators are not barred by the probate exception…..Such a claim does not ask the court in which it is filed to administer the estate, but rather to impose tort liability on the guardians for breach of fiduciary duty….[t]he probate exception can no longer be used to dismiss `widely recognized torts' *such as* breach of fiduciary duty or **fraudulent misrepresentation** merely because the issues intertwine with claims proceeding in state court." Id at 153-154.(emphasis supplied). *In the case at bar, most if not all claims are based on fraud and/or breach of fiduciary duty, and thus not barred by the probate exception.*

## **As to Tortious Interference:**

In Garruto v. Cannici, , 397 N.J. Super. 231, 242-43 (App. Div. 2007), the court held that "a claim for tortious interference with an anticipated inheritance is unavailable **when an adequate probate remedy exists.**" Id. Accordingly, it is

respectfully submitted that an adequate probate remedy <u>does not</u> <u>exist</u> for the ERISA claims regarding the theft of 401K funds valued at 100K, as they involve complex issues of preemption of state law.  In addition, there is no probate remedy regarding the sale of the lucrative Toben property, Predicate Act VII, valued at 1.5M and sold for half of that amount, since the property has already been sold, and the proceeds were paid to *third parties*, e.g., the **Morey La Rue** Company, over which the Probate Court has no jurisdiction.

**X.  Proposed Seconded Amended Complaint:  SEC 10b-5, Fraudulent Concealment, Breach of Fiduciary Duty, Aiding and Abetting, Civil Conspiracy, and Related RICO Predicate Acts; Liability of Thomas S. Howard, Esq.**

The plaintiff respectfully moves to amend the complaint ("SAC", **Ex. A**) pursuant to FRCP 15(a)(2) and Arab African International Bank v. Epstein, 10 F.3d 168 (3d Cir. 1993), with the following counts: **Count XII:** SEC 10b-5[12], **Count XIII:**

---

[12] **"De Facto Seller"** theory in relation plaintiff's 40% stake in her husband's company. See e.g., Heyman v. Heyman, 356 F. Supp. 958, 964-66 (S.D.N.Y. 1973) (trust beneficiary had standing to seek relief under section Rule 10b-5 without the purchase or sale of a security because **the beneficiary** had been **a de facto seller**).  See also Ill. Rule 10B-5, 35 Wash. & LeeL. Rev. 799 (1978), ("De facto seller exception has been applied where the real party in interest, i.e., the party whose economic interests are harmed or benefited by the transaction, is not the legal title holder of the securities at the time of the sale, and .. not the actual seller...")

Breach of Fiduciary Duty, **Count XIV:** Aiding and Abetting[13],

**Count XV:** Fraudulent Concealment[14] and **Count XVI:** Civil

Conspiracy[15]. Pursuant to these Counts, plaintiff also moves to

amend Predicate Act VI, Litigation Fraud, to Allege Count XII,

Rule 10b-5, and Count XV, Fraudulent Concealment, as additional

RICO predicate acts.

---

[13] See Scheidt v. DRS Techs, 424 N.J. Super. 188 (A.D. 2012) ("*To state a claim for aiding and abetting, a plaintiff must demonstrate (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the defendants who are not fiduciaries.*") In the case sub judice, Mr. Fabian is the fiduciary, and defendants Howard, Gold, Rajs, Keh, D'Ambrosio, Capece, et al, knowingly assisted Mr. Fabian for repayment of his indebtedness.

[14] *See* Williams v. BASF Catalysts LLC*,* 2016 U.S. Dist. LEXIS 46273(D.N.J. Apr. 5, 2016)("*the tort of fraudulent concealment can be invoked to cover a variety of factual circumstances. Relevant to this action, it has been applied to concealment of evidence, as well as spoliation.*") See also, see Rosenblit v. Zimmerman, 166 NJ 391, 406-7 (2001) (listing the five elements of the tort  which include the requirement that defendants "*intentionally withheld, **altered** or destroyed the evidence with purpose to disrupt the litigation*".)(emphasis supplied).

[15] Pursuant to *Banco Popular N. Am. v. Gandi*,184 N.J. 161, 172-3 (2005)("*two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement ... and an overt act that results in damage...It is enough..if you understand the general objectives ... accept them, and agree, either explicitly or implicitly, to do your part to further them...the gist of the claim is not the unlawful agreement, b*ut the underlying wrong which..*" Ibid. See also Eli Lilly and Co. v. Roussel Corp., 23 F.Supp.2d 460, 496 (DNJ 1998).   In the case at bar, the RICO conspiracy plead herein gives rise to this tort.

Lastly, but no less importantly, the undersigned seeks to amend the complaint to add three additional <u>FRCP 19(a)</u> parties, Mr. Fabian's current counsel **Thomas S. Howard**[16], **Esq.**, as well as his law firm **Gartenberg Howard, LLP**, particularly as it relates to Mr. Howard's systemic and intentional fraudulent misrepresentations in State Court,    which has resulted in plaintiff's inability to prevail in Chancery division, and which as of recent, on January 14, 2019, resulted in a "no comment" denial of a comprehensive interlocutory appeal.[17]    The plaintiff also seeks to amend the complaint to add **Morey La Rue Inc**, which per <u>Predicate Act VII</u> is a shell company which received the proceeds of the illicit sale of lucrative Toben commercial property, which was 51% the property of plaintiff.

QED.

Respectfully Submitted.
Dated:  January 22, 2019

Santos A. Perez /s/
-------------------
Attorney For Plaintiff

---

[16] Specifically, plaintiff seeks to add **Mr. Thomas S. Howard**, Esq., and *Gartenberg Howard, LLP*, to the Fraudulent Concealment, Aiding and Abetting, and RICO Counts. <u>See</u> <u>Richmond, Douglas R., Fraud and Misrepresentation Claims Against Lawyers (February 5, 2016). Nevada Law Journal, Vol. 16, 2015</u>.

[17] The fraudulent concealment in the case *sub judice* is set forth at <u>¶11, Post Suit Litigation.</u>  The SAC references Ms. Howard's fraud in the appellate division, which resulted in a "no comment" denial, as well as the litigation-based fraud of late 2018 involving inter alia the Sun Bank 2013 lawsuit.